**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **AMERICAN MEDICAL EXPERTS®, LLC**<br>**a Virginia Limited Liability Company,**<br>**25448 Fritz Court, Aldie, Virginia 20105**<br>**Plaintiff,**<br><br>v.<br><br>**RONNY NIZAR HAMAD**<br>**25642 Balint Park Court**<br>**Aldie, Virginia 20105**<br>**and,**<br>**PRIME MEDICAL EXPERTS LLC**<br>**a Virginia Limited Liability Company,**<br>**25642 Balint Park Court**<br>**Aldie, Virginia 20105**<br>**and,**<br>**JOHN DOE**<br>**and,**<br>**JANE DOE**<br>**(collectively Defendants).** | **CASE NO.  1:20-cv-1074**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff American Medical Experts®, LLC ("AME") hereby complains and alleges

jointly and severally against Ronny Nizar Hamad ("Hamad"), Prime Medical Experts ("PME"),

John Doe, and Jane Doe ("Does") as follows:

## NATURE OF ACTION

1.        Plaintiff brings this civil action for permanent injunctive relief and damages

arising out of: (1) Defendants' blatant and willful infringement of Plaintiff's copyrighted

website, in violation of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* ("Copyright Act")

by copying Plaintiff's website; (2) Defendants' blatant and willful infringement of Plaintiff's

copyright in violation of the Copyright Act by creating a derivative work of Plaintiff's

copyrighted website; (3) Defendant Hamad's blatant, intentional and material breaches of two

- 1 -

separate employment agreements; (4) Defendant Hamad's intentional and willful breach of fiduciary duty and duty of loyalty to Plaintiff to intentionally harm Plaintiff; (5) Defendant Hamad's unlawful and unauthorized conversion of AME's trade secrets, confidential and proprietary information; (6) Defendant Hamad's unlawful and unauthorized misappropriation of AME's trade secrets in violation of the Virginia Uniform Trade Secrets Act; (7) Defendant Hamad's malicious and intentional violation of the Virginia Computer Crimes Act; (8) Defendants' unlawful common law conspiracy to harm AME's business; and (9) Defendants' unlawful conspiracy to damage AME's business in violation of Va. Code. 18.2-499-500.

## PARTIES

2.        Plaintiff AME is a limited liability company duly organized and existing under the laws of the Commonwealth of Virginia and operates from its principal place of business in the Kirkpatrick Farms Subdivision in Aldie, Virginia.

3.        Upon information and belief, Defendant Hamad resides in the same Kirkpatrick Farms Subdivision in Aldie, Virginia.

4.        Upon information and belief, Defendant PME operates its principal place of business in Defendant Hamad's residence, which is geographically less than a mile away from Plaintiff's principal place of business.

5.        Upon information and belief, Defendant PME is a limited liability company organized on June 17, 2018 (formerly known as Medlaw Consulting Group, LLC), and existing under the laws of the Commonwealth of Virginia and has its principal place of business in Aldie, Virginia.

## JURISDICTION AND VENUE

6.        This action arises under the Copyright Act.  This Court has original subject

matter jurisdiction over Plaintiff's copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because the remaining claims are so related to the Copyright claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.      This Court has personal jurisdiction over Defendant PME because Defendant PME resides in and/or does systematic and continuous business in the Commonwealth of Virginia and this judicial district.

9.      Defendant PME maintains a principal place of business in Aldie, Virginia, and has systematically conducted and does conduct business within the Commonwealth of Virginia and the Eastern District of Virginia.

10.     Many of the acts complained of herein occurred in Virginia and this judicial district. For example, upon information and belief, Defendants copied AME's website in Virginia and this judicial district.

11.     Venue in this district is appropriate under 28 U.S.C. §§ 1391 and 1400 because Defendant PME has its principal place of business in the Commonwealth of Virginia and the Eastern District of Virginia, and because a substantial part of the events giving rise to the dispute occurred in the Eastern District of Virginia.

12.     The parties are all domiciliaries and residents of this judicial district and all events described, *infra*, unless otherwise identified, occurred or were initiated in this judicial district.

## FACTUAL BACKGROUND

13.     AME is a family-owned business that Mr. Eric Jacobs and Mrs. Ruba Jacobs,

the principals of AME, built over 3 decades into an extraordinarily successful business, *inter alia*, matching expert medical witnesses with litigants, *e.g.*, plaintiffs and defendants lawyers and insurance companies in need of specific types of medical experts in a very unique and cost effective manner.

14.     Mr. and Mrs. Jacobs have spent their professional adult lives learning and creating this business from the ground up working long hours, nights, weekends, and holidays.

15.     AME was not an overnight success, but required years to become a profitable business from which Mr. and Mrs. Jacobs could earn a decent living; however, this living is now threatened by Defendants' unlawful and illegal actions.

16.     At all times pertinent, Plaintiff AME was a limited liability company in good standing in Virginia.

### AME Hires Defendant Hamad

17.     A friend of the Jacobs family, Defendant Hamad initially began his relationship with AME in February 2013 as an independent contractor just after Mr. Hamad finished high school.  Mr. Hamad initially worked as an administrative assistant – starting at $10 an hour to help with office tasks.  Plaintiff trained Mr. Hamad in all aspects of the business, both front-end, (*e.g.*, such as interacting with clients and experts) and back-end (*e.g.,* such as creating client lists and marketing emails).

### Defendant Hamad Enters into Two Agreements with AME

18.     From almost the beginning, Mr. Hamad frequently demanded salary increases even immediately after receiving an increase.

19.     On one such occasion, on or about Friday March 6, 2015, Mr. Hamad threatened to quit if Hamad was not given a substantial pay increase or equity in AME.

20.     On Saturday, March 7, 2015 Mr. Eric and Mrs. Ruba Jacobs met with Mr. Hamad to discuss a pay increase proposal.

21.     AME then accepted Hamad's resignation, at which time Hamad signed a Non-Disclosure and Termination Agreement ("NDA") (attached as Exhibit B).

22.     The NDA further stated that AME "has developed a large and extensive trade with a substantial number of clients which are of great value to AME."

23.     According to the terms of this NDA, Hamad agreed that the covenants contained in the NDA were "necessary to protect the business good will, business interests, business practice and proprietary rights of [AME]."

24.     Hamad further agreed not to disclose to anyone outside of AME and of AME's "customer lists, expert witnesses, trade secrets, and other proprietary or confidential information" pertaining to AME.

25.     Hamad further agreed not to compete with AME after leaving AME for five years, based on both agreements in 2015 and 2019.

26.     Hamad further agreed not to "disclose trade secrets, special training, clients, business model/secrets, or proprietary rights" of AME which Hamad "learned or became aware of during Contracting work with [AME]."

27.     The next day, Sunday March 8, 2015 Mr. Hamad expressed interest in continuing to work at AME.

28.     Upon then returning to work, Mr. Hamad immediately asked for a pay increase.

29.     Plaintiff and Hamad then agreed to a significant compensation package outlined in an agreement entitled Non-Disclosure and Employment/Contractor Agreement dated March 8, 2015 (attached as Exhibit C).

30.     This second agreement with Hamad included the same non-disclosure and non-compete provisions as the first agreement.

31.     According to this second agreement, AME compensated Hamad in a performance based tiered structure concomitant with increased responsibilities and expectations.

32.     Hamad accepted the Non-Disclosure and Employment/Contractor Agreement dated March 8, 2015 attached as Exhibit C by continuing to accept compensation per the terms of the agreement for the 4½ years following the agreement.

33.     The chart below shows Hamad's compensation for the approximately 6½ years he worked for AME.

| Year | Annual Compensation |
|------|---------------------|
| 2013 | $16,500 |
| 2014 | $28,440 |
| 2015 | $61,264 |
| 2016 | $82,963 |
| 2017 | $102,689 |
| 2018 | $114,935 |
| 2019 | $139,622 |
| **Total** | **$546,413 within 6½ year period** |

**Defendant Hamad Gains Full Access to AME's Trade Secrets**

34.     During the years following March 2015, Hamad gained full access to AME's proprietary information, business model, clients, medical experts, billing scales, copyrighted assets, trade secrets and highly confidential and client sensitive customer data.

35.     Hamad frequently worked from home and was trusted with access to AME's computer files and business records, even taking home copies of AME's computer files to use while working from home.

36.     Upon information and belief, Hamad sent AME's list of clients to Hamad's private email address along with other AME related emails without authorization from AME.

### Hamad's Work Performance Declines

37.     Following the March 2015 arrangement, Hamad would frequently request ownership of AME, which Mr. and Mrs. Jacobs repeatedly rejected because they wished to keep AME as a family owned business.

38.     Beginning in 2018 Hamad's work performance started to decline, and towards the end of 2018, Hamad's performance dramatically dropped until his last day in 2019.  Mr. Hamad was not fulfilling and honoring his work responsibilities, became extremely argumentative, difficult to work with, withheld critical data and refused to share critical company data with co-workers, which in turn created additional work, chaos and stress on Mr. and Mrs. Jacobs, as well as with these co-workers.

39.     During 2018 Hamad became very selective with his responsibilities. Hamad had to be constantly reminded of his tasks, either verbally, or via email or text messages.  Hamad was only working on tasks that would affect his paycheck and neglecting the rest of his responsibilities, as to ensure he would maximize his biweekly paycheck.

40.     Part of Hamad's responsibilities included entering information into AME's computerized case management system regarding new leads, cases and details on the cases with specific statuses.  However, Hamad repeatedly failed to do so and was very reluctant to give out or share any information on cases.

### Hamad Falsified Accounting Records

41.     In breach of his fiduciary duty to AME, Hamad falsified entries on his accounting sheet to obtain higher commission than earned.

42.     For example, Hamad would purposely underestimate the amount to be paid for an expert so Hamad could get a higher commission on sales to over inflate the numbers.  Hamad would simply manipulate the margin (sale minus paying the expert) noting lower amount to the expert in his accounting sheet to increase commission during a specific pay period.  This enabled Hamad to double his commission rate resulting in a higher paycheck. Hamad would then push the additional adjustment to the following pay period to get his bonus pay.

43.     On or about 13 December 2019, Hamad abruptly departed AME's office to his home due to a bookkeeping/reconciliation conflict that arose, which was finalizing his commission pay after reconciling the books.

44.     The extent of this falsification remains under investigation and will be proven at trial.

### Hamad Forms PME While Working for AME

45.     Upon information and belief, Hamad was unable to complete his work because Hamad was building a competitor to AME in 2018 while simultaneously being paid by AME and enjoying the access to AME's trade secrets and confidential and proprietary information to use to build PME.

46.     While working as a Director for AME, Hamad formed PME – a direct competitor to AME – at least as early as June 17, 2018 and a full 18 months before resigning from AME. *See* Exhibit D, which shows the Virginia State Corporation Organization Certificate for Medlaw Consulting Group LLC (now PME) along with the name change filed January 29, 2020 to PME. And s*ee*, Exhibit E, which shows Hamad's self-reported information regarding PME to the Better Business Bureau indicating PME has been in business since June 17, 2018.

47.     Hamad initially formed PME as MedLaw Consulting Group LLC stealing the

name "MedLaw" from Mr. Eric Jacobs, Director of AME, who had a license plate from an old

car with the name "MED LAW" on it hanging in his office, which was visible to everyone in the

office, and in particular Mr. Hamad who used to sit right across from it.

48.       During this 18-month overlap, Hamad enjoyed unfettered access to AME's trade

secrets, confidential and proprietary information, customer lists, expert database, and decades

worth of information and data collected by AME during its entire existence.

49.       Hamad deliberately hid the fact that he formed MedLaw Consulting Group LLC

from the Jacobs for at least 18 months so Hamad could steal from AME everything needed to

create PME while being paid nearly $250,000 by AME to do so.

### Hamad Stole AME's Business Model

50.       Upon information and belief, Mr. Hamad created PME and assembled a

business model for PME that is identical in all respects to that of AME using AME's confidential

and proprietary information and trade secrets to do so.

### Hamad Stole Marketing Leads from AME

51.       Upon information and belief, Hamad received AME's marketing leads after

hours when AME's telephone lines were forwarded to Hamad's personal cell phone (*i.e.*, 703-

717-3292), which is the same number listed by Hamad as PME's telephone number in PME's

Better Business Bureau listing (*see* Exhibit E).

52.       This same telephone number is now associated with PME, and is listed on

PME's Website and on other pages used for advertisements – even in the Yellow Pages™ under

AME's listing.

53.       Hamad used calls forwarded from AME's telephone number to his personal

telephone number while working at AME for Hamad's benefit and to the severe detriment of

AME, which paid for these leads, to build PME.

54.     Upon information and belief, Hamad was receiving calls for AME on his cell phone on nights and weekends and then doing business with the entities from these calls as PME – all while continuing to work for and be handsomely compensated by AME.

55.     Upon information and belief, Mr. Hamad was taking new clients to PME from AME that were originated by AME's marketing.

56.     Hamad refused to use the cell phone AME provided to Hamad, and consequently many of AME's clients and experts would call Hamad directly on Hamad's personal cell phone to discuss current and new cases not knowing they were discussing these cases with PME and not AME.

57.     After leaving AME, Hamad refused to remove any of the clients or experts from his personal cell phone.

58.     For PME's benefit and use and to the detriment of AME, Hamad forwarded many of AME emails to his personal email address.

59.     On numerous occasions, Hamad forwarded Hamad's AME email address to his personal email account and responded to AME's clients and experts from his personal email account, to which PME now has access as Hamad refused to remove AME's emails from his personal devices.

60.     Realizing his actions were improper, Hamad cautioned existing and potential AME clients not to tell AME that they were working with Hamad at PME to avoid discovery by AME.

61.     Upon information and belief, Hamad was inducing customers to leave AME for PME while still working for AME.

- 10 -

62.     Upon information and belief, Hamad contacted AME's customers and experts while working for PME – during and after his employment with AME – in violation of both non-compete and employment agreements.

63.     Hamad violated his fiduciary duty and contractual obligations to AME not to channel AME customers to his competing company, PME, while working for AME.

**Hamad Stole AME Trade Secrets**

64.     Upon information and belief, Mr. Hamad stored AME's proprietary business email correspondences, (including but not limited to, documents attached to emails, templates, specific verbiage used to communicate with clients/experts), clients' contacts and confidential expert lists and contacts on his personal mobile telephone.

65.     Upon information and belief, Mr. Hamad stored AME's proprietary business clients and confidential expert lists on Hamad's personal computer at his home.

66.     Upon information and belief, Mr. Hamad used AME's proprietary business clients and confidential expert lists to form PME's business, which is identical in every respect to that of AME's, albeit with some cosmetic variations as in PME's name, almost mirroring AME in every aspect.

67.     Immediately after Mr. Hamad's resignation, AME sought to protect AME's trade secrets and other confidential and proprietary information by demanding that Hamad return all such information, but Hamad refused.

68.     By refusing to return AME's trade secrets and confidential and proprietary information, Hamad effectively converted AME's trade secrets and confidential and proprietary information to his own use.

69.     Hamad stored on his electronic devices (both AME provided and owned

electronic devices, *i.e.*, computer and smart phone, and Hamad's personal electronic devices, *i.e.*, computer and smart phone) extremely sensitive data and information of AME's, which included AME's trade secrets and confidential information, such as AME's emails and attached documents (such as medical records, reports from experts, invoices to clients, billing and wire info), AME's client lists and contact information, and AME's expert lists and contact information, AME's business model, fee structure, and all documentation from 2007-2019, over 12 years of AME data since the in-house server was acquired.

70.     Hamad refused to remove from his personal electronic devices AME's extremely sensitive data and information of AME's, which included AME's trade secrets and confidential information, such as AME's client contact information, and AME's expert lists and contact information, and all documentation download to electronic devices, including Hamad's personal phone.

71.     Hamad refused to return AME's electronic devices which AME had provided to Hamad as part of his office tools.

72.     Hamad failed to remove AME provided software, for which AME had paid licenses to the software providers, from his electronic devices. This includes Microsoft office 365 and its associated applications, and Adobe Pro, etc.

73.     AME's emails, client and expert list and related contact information is highly protected information the loss of which would severely cripple AME's ability to conduct its business.

74.     AME's emails, client and expert list and related contact information comprises a significant trade secret of AME, and AME goes to great lengths to keep this information from competitors, such as PME.

75.     Hamad misappropriated AME's trade secret information comprising at least AME's expert list and related contact information and AME's customer list and related contact information.

76.     Hamad misappropriated company trade secrets, including but not limited to customer contact information in AME's server, data from AME's QuickBooks Online, Zoho CRM, iContact list used for email campaigns, and expert databases, which include expert specialties, email addresses, telephone numbers, fee schedules, experts Curriculum Vitae (CV), social security numbers, or Employer Identification Number, and other expert specific notes and additional information on AME's server and other old documents found on AME's server.

### Hamad Copied AME's Website

77.     Plaintiff owns the copyright for AME's website, the registration certificate for which is attached as Exhibit A.

78.     Upon information and belief, Defendants completely plagiarized and copied AME's copyrighted website to create PME's first version of its website located at URL www.primemedicalexperts.com.

79.     Upon information and belief, Defendants then created a new version of PME's website that again completely plagiarized and copied AME's copyrighted website. *See* Exhibit F, which shows a side by side comparison of AME's website and both versions of PME's website.

80.     During the process of creating these two website versions, Defendants made unauthorized copies of AME's copyrighted website in violation of Plaintiff's rights under the Copyright Act.

81.     Defendants copied AME's website's look and feel to create PME's website to directly compete with AME and to present PME as an able competitor.

82.     For example, Defendants copied AME's unique two-step process service at a reduced rate that AME advertises online to attract consumers to provide the best suitable experts for their cases, and get an opinion from that expert under the first step of AME's fee schedule. PME terms the same two-step process "a two-phase process" using rates for each part similar to AME but lower to attract clients and steal the existing ones from AME.

83.     PME can afford to charge less because PME did not have to create the business from the ground up but rather stole the entire business from AME.

84.     Defendants copying of AME's website was so complete that Defendants even copied grammatical and typographical errors.

85.     Upon information and belief, Defendants created a derivative work of AME's copyrighted website in violation of Plaintiff's rights under the Copyright Act.

86.     Upon information and belief, John Doe and/or Jane Doe directly copied AME's website during the preparation of PME's website and/or assisted Hamad in the preparation of the PME website that was based on AME's website.

87.     Defendants copied almost every aspect of AME's website, including but not limited to website content, including typos and grammatical errors, AME's unique fee structure, look and feel of website, same color scheme, mapping of pages, listing of Experts and description of services, etc.

88.     The end result of the complete copying of AME's website and the similarity of the names in combination with undercutting of the fee structure advertised by AME creates the illusion of a similar company with the same expert database but significantly cheaper, thereby luring customers from AME to PME, to try to destroy AME.

89.     Some examples of content directly copied from AME's website are shown in

Table 1 in Exhibit G.

**Hamad Purloined AME's Google Adwords Campaign**

90.     Upon information and belief, Hamad and/or John Doe and/or Jane Doe accessed AME's Google Ads account without authorization from AME to copy AME's Google Ads marketing campaign to use the same information in PME's Google Ads marketing.

91.     AME has experienced a significant drop in marketing leads from its Google Adwords spending due entirely to PME's outbidding of AME for the same customers, which is only possible due to Defendants' copying of Plaintiff's website.

92.     Plaintiff's drop-in marketing leads due to Defendants' copyright infringement is causing a loss in revenue and profit to AME, which is accumulating significantly and will be proven at trial.

93.     Plaintiff is now spending more money on Google Adwords to compete with PME, which Plaintiff would not have had to spend without Defendants' copyright infringement. The amount of this is accumulating and will be proven at trial.

94.     As a direct and proximate result of Defendants' copying of Plaintiff's website, PME has been able to drive customers to its website by outbidding Plaintiff's Google Ads, which PME only knows due to Hamad's misappropriation of AME's trade secrets, in this case AME's Google AdWords budget, pricing and keywords, all of which form part of AME's Google Adwords Campaign.

**Hamad Intentionally Created Confusion by Changing the Name to PME**

95.     Subsequently, on January 29, 2020 Mr. Hamad changed the name of MedLaw Consulting Group LLC to Prime Medical Experts LLC ("PME") to more explicitly show that PME was a direct competitor to AME.

96.     Hamad modified the name of "MedLaw Consulting Group LLC" to "Prime Medical Experts LLC" in an attempt to create confusion among potential customers of American Medical Experts and lure traffic from AME's website to PME's website.

97.     AME is the owner of U.S. Registration No. 4,519,480 filed July 10, 2013 and registered on the Supplemental Register April 22, 2014 for the Service Mark AMERICAN MEDICAL EXPERTS® for medical legal consulting services.

98.     Upon information and belief, Defendants used "American Medical Experts®" – a federally registered trademark owned by AME – in its Google® AdWords™ keyword searches to drive traffic from AME to PME.

**Hamad Purloined AME's Proprietary and Confidential Information**

99.     Upon information and belief, Defendants copied AME's iContact newsletter campaign to create the same newsletter campaign for PME.

100.     In short, nothing of PME's business was developed without the use of AME's proprietary information and trade secrets.

101.     Upon information and belief, PME could not have been built so quickly to the point of generating revenue and profit without the use of AME's proprietary information, confidential information and trade secrets AME learned and developed over the course of three decades in the business.

102.     Hamad and/or Jane Doe and/or John Doe built PME entirely out of confidential information, proprietary information, and trade secrets purloined by Hamad in violation of Hamad's contractual obligations not to disclose or use such information to compete with AME.

103.     Mr. Hamad abruptly resigned on December 13, 2019 – 18 months after starting PME, and apparently after creating a suitable income stream by stealing AME's customers and

business.

104.     Hamad converted confidential and proprietary information, including but not limited to AME developed email templates (how to communicate with clients, experts, how to resolve issues, etc.), Google Ads Marketing and Advertisement, including but not limited to copies of ad campaigns, budget structure, fee schedule and unique business model.

105.     Upon information and belief, Hamad converted AME's newsletter and verbiage in the newsletter, as well as all email addresses collected throughout the years representing decades of AME's work to create a targeted audience designed to produce leads.

106.     Upon information and belief, Hamad stole AME's introductory email template and verbiage (AME's work) to use when conducting business under PME.

107.     Upon information and belief, Hamad stole AME's invoice template and verbiage (AME's template for years) to use when conducting business under PME.

108.     Upon information and belief, Hamad stole AME's Work Product Report template and verbiage (AME's work) to use when conducting business under PME.

109.     Upon information and belief, Hamad converted AME data stored on AME's server, which Hamad copied onto an external hard drive(s) and never returned.

### AME Damaged Significantly by Defendants' Conduct

110.     AME lost customers to PME as a direct and proximate result of the aforementioned conduct by Hamad and the other Defendants. The actual lost profits due to these lost customers is unknown at this time, but will be proved at trial.

111.     AME lost experts, via which AME derives revenue, to PME as a direct and proximate result of the aforementioned conduct by Hamad and the other Defendants.  The actual lost profits due to these lost experts is unknown at this time, but will be proved at trial.

112.     AME lost profits as a direct and proximate result of the aforementioned conduct by Hamad and the other Defendants in an amount to be proven at trial.

113.     PME's profits were generated entirely from the intellectual property of AME, *e.g.*, copyrights, trademarks, trade dress, trade secrets, and confidential and proprietary information belonging to AME, which was infringed and/or purloined by Defendants.  As a result, PME's profits are rightly AME's profits.

114.     AME has suffered increased advertising costs directly attributable to Defendants' conduct because AME has been forced to increase its Google Adwords expenditures each month to maintain the same number of leads generated from this advertising.

115.     AME must spend more on Google Adwords because AME must now compete online with PME, which employs the same Google Adwords because Hamad stole AME's Google Adwords campaign.

116.     Moreover, AME must compete with PME online due to the copyright infringement by Defendants and PME appears to be an equal competitor to AME but cheaper.

117.     AME has spent over $50,000 more on Google Adwords when comparing same time period for this year and last year – March through August,  and this amount is increasing every month and will continue until PME's copyright infringing website is taken down.

118.     Additionally, AME's business has significantly been devalued due to Hamad building PME with an identical business model as AME by using AME's data and trade secrets as AME is now sharing the market with another competitor that appears to be equal in capability, but cheaper.

119.     Hamad deceived AME's  clients into believing that he was still working at AME to get PME up and running and perhaps working with new clients, under Med law consulting.

120.     Hamad specifically told AME clients not to tell AME they were working with Hamad.

121.     As of August 31, 2020. Hamad accidentally sent an email to his old AME email address, and owners discovered on that day, not only he's working with an AME existing expert and client, but also same case of that AME.

122.     Upon information and belief, Hamad attempted to access AME Office 365, AME Outlook, after quitting AME, but he was denied access as owners immediately changed credentials.

123.     By January 2020, upon information and belief, Hamad was aided and abetted by John Doe and/or Jane Doe, in establishing PME for the wonton and malicious purpose of destroying or injuring AME in its special "niche" market.

124.     PME's entire revenue stream was built completely on the theft of AME's trade secrets, proprietary business information, intellectual property, and copyrighted information.

## <u>FIRST CLAIM FOR RELIEF</u>

### Copyright Infringement (17 U.S.C. §§ 106, 501) Against Defendants

125.     AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 124 above and incorporates them by reference.

126.     AME filed a copyright application entitled American Medical Experts Website on March 3, 2020 and received Registration No. TX0008849518. A copy of the copyright for the website is included as Exhibit A.

127.     AME is the owner of the copyright for the website on the Internet located at the uniform resource locator https://americanmedicalexperts.com/.

128.     A notice of the ownership of this website is included on the bottom of the

website, which states "© 2018 American Medical Experts, LLC. All Rights Reserved."

129.    Upon information and belief, Defendants copied AME's copyrighted website without authorization during the process of creating PME's website.

130.    Defendants thereby infringed AME's copyrights in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

131.    Defendants acts of infringement are willful, intentional, and purposeful, and in disregard of and with indifference to AME's rights.

132.    As a direct and proximate result of said infringement by Defendants, AME is entitled to damages in an amount to be proven at trial.

133.    AME is also entitled to PME's profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

134.    AME further is entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

135.    As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

136.    AME is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, PME will continue to infringe AME's copyrights in AME's website.

137.    AME seeks and is entitled to preliminary injunctive relief pending trial as the injury that AME will suffer pending trial will be substantial, immediate and irreparable for which there is no adequate remedy at law.

- 20 -

138.    AME is also entitled to a permanent injunctive relief to restrain and enjoin

Defendants' continued willful infringing conduct.

## SECOND CLAIM FOR RELIEF

### Copyright Infringement (17 U.S.C. §§ 106, 501) Against Defendants

139.    AME hereby restates and re-alleges the allegations set forth in paragraphs 1

through 138 above and incorporates them by reference.

140.    Upon information and belief, PME created its website based on AME's

copyrighted website.

141.    At best, PME's website merely consists of minor editorial revisions,

annotations, elaborations, or other modifications of AME's copyrighted website.

142.    Upon information and belief, Defendants created a website for PME that was

completely derived from the copy of AME's website.

143.    PME's website is a derivative work of AME's copyrighted website as defined in

17 U.S.C. § 101.

144.    Defendants' violated AME's exclusive right to prepare derivative works based

on AME's copyrighted website in violation of 17 U.S.C. §§ 106(2) and 501.

145.    Defendants thereby infringed AME's copyrights in violation of Sections 106

and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

146.    Defendants acts of infringement are willful, intentional and purposeful, and in

disregard of and with indifference to AME's rights.

147.    As a direct and proximate result of said infringement by Defendants, AME is

entitled to damages in an amount to be proven at trial.

148.    AME is also entitled to PME's profits attributable to the infringement, pursuant

to 17 U.S.C. § 504(b), including an accounting of, and a constructive trust with respect to such profits.

149.     AME further is entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

150.     AME is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, PME will continue to infringe AME's copyrights in AME's website.

151.     AME seeks and is entitled to preliminary injunctive relief pending trial as the injury that AME will suffer pending trial will be substantial, immediate and irreparable for which there is no adequate remedy at law.

152.     AME is also entitled to permanent injunctive relief to restrain and enjoin Defendants' continued willful infringing conduct.

### THIRD CLAIM FOR RELIEF

**Breach of Contract (Hamad)**

153.     AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 152 above and incorporates them by reference.

154.     Hamad entered into an independent contractor agreement with AME for which he was paid over a half a million dollars within the 6½ year period, and $250,000 during the last two years alone.

155.     The agreement with AME contained restrictions relating to Hamad's post-AME business activity, specifically, the non-compete and non-disclosure aspects of the agreement.

156.     Hamad accepted the terms of his relationship with AME as an independent contractor, and in return enjoyed the financial rewards for almost five years.

157.     By accepting the compensation terms set forth in the agreement between the parties, Hamad ratified the terms of the agreement.

158.     Hamad has breached the Independent Contractor agreement with AME by engaging in conduct, as described herein, in direct violation of the terms contained within the Independent Contractor agreement, inclusive of the implied duty of good faith and fair dealing, as related to contracts.

159.     Hamad remains in breach of the Independent Contractor agreement and is anticipated to continue to breach the Independent Contractor agreement.

160.     By reason of this breach and threatened and continuing breach of the Independent Contractor Agreement, AME has suffered substantial injury, including, but not limited to, impairment of its relationships with its clients and experts, loss of business and prospective business, loss of good will, and other injury.

161.     Hamad entered into an agreement to not compete with PME.

162.     Hamad breached the agreement in a wonton, dishonest, and malicious manner so as to injure AME by creating and working with PME to directly compete with AME for 18 months while simultaneously working with AME.

163.     As such, Hamad's breach of the agreement was motivated by actual malice for the unlawful purpose of injuring AME, as alleged, supra.

164.     Hamad agreed not to disclose certain trade secrets and confidential information of AME.

165.     Hamad violated that agreement by transferring trade secrets and confidential and proprietary information to PME to directly compete with AME using AME's own trade secrets and confidential and proprietary information.

166.    Hamad refused to remove AME's trade secrets and confidential and proprietary information from his personal computer and personal cell phone after resigning from working with AME.

167.    Hamad then continued to use AME's trade secrets and confidential and proprietary information to obtain new clients for PME and operate PME's business in direct competition with AME.

168.    Upon information and belief, PME could not have been started without the use of AME's trade secrets and confidential and proprietary information.

169.    AME suffered damages in an amount to be proved at trial, but at least in an amount exceeding $250,000 which represents the amount paid to Hamad while Hamad was building a competing business from AME's trade secrets and confidential and proprietary information that Hamad purloined from AME.

170.    As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

171.    AME is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, PME will continue to breach the agreements with AME and use AME's trade secrets and confidential and proprietary information that Hamad purloined from AME.

172.    AME is entitled to permanent injunctive relief to restrain and enjoin Defendants' continued conduct.

## **FOURTH CLAIM FOR RELIEF**

### **Breach of Fiduciary Duty (Hamad)**

173.    AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 172 above and incorporates them by reference.

174.    AME's officers and directors placed special confidence in Hamad, whose parents were social and cultural friends of the Jacobs and lived in the same neighborhood Kirkpatrick Farms subdivision.

175.    As a director of AME, Hamad came to be trusted with the complete array of propriety information, trade secrets and methods, and AME's complete records of business confidences and secrets.

176.    For a sneaky and malicious purpose, Hamad deliberately betrayed, with deliberate and conscious disregard of the special confidences innocently granted him by violating the trust to which he was obliged to honor.

177.    In the breach of his duty of loyalty, duty of care, and obligation of good faith and fair dealing, Hamad violated the trust in him by deliberately and malevolently embarking on a path of embezzling AME's records with the motive of destroying his employers' business.

178.    Hamad maliciously defied the terms of his employment agreement, which granted Hamad conditional access to AME's propriety and secret databases.

179.    Hamad clandestinely pilfered the complete records of AME and purloined, or embezzled AME's intellectual property to his own economic profit designed to destroy or cripple AME's business.

180.    Hamad had long planned the unlawful steps he took to betray AME's trust in him.

181.    Hamad breached of common law duties of loyalty, fidelity and responsibility, including the duty to maintain secrecy of confidential information learned during employment.

182.     Hamad had a duty to AME principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the AME's use.

183.     Hamad misappropriated AME's trade secrets, misused AME's confidential information for Hamad's benefit and solicited AME's clients for at least 18 months prior to termination of Hamad's employment with AME.

184.     Hamad wrongfully took, retained, and used AME's proprietary or trade secret information to form and build PME all the while Hamad was working with AME.

185.     As a result of Hamad's breach of the common law duty of loyalty, fidelity and responsibility to maintain the secrecy of confidential information learned by Hamad during employment, AME suffered damages in an amount to be proved at trial.

186.     As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

187.     AME is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, PME will continue to use AME's trade secrets and confidential and proprietary information that Hamad purloined from AME.

188.     AME is entitled to permanent injunctive relief to restrain and enjoin Defendants' continued conduct.

## FIFTH CLAIM FOR RELIEF

### Conversion (Hamad)

189.     AME hereby restates and re-alleges the allegations set forth in paragraphs 1

through 188 above and incorporates them by reference.

190.     Hamad wrongfully exercised or assumed authority over AME's customer contact information, depriving AME of its exclusive use and possession in denial of or inconsistent with AME's rights in such information.

191.     Hamad wrongfully exercised and assumed control over AME's valuable property for the actual malicious intent to diminish AME market share, and cripple or destroy AME'S business relationship with their expert witnesses and legal clients.

192.     Hamad, acting for all Defendants, wrongfully exercised control and copied for his unlawful use, AME's entire secret and propriety business information for the dual purpose of devaluing the economic utility of AME's business to his own dishonest profit.

193.     Hamad actions were an attempt not only to economically cripple or destroy AME's business but to also to destroy the Jacobs, who owned AME.

194.     Hamad's actions show actual malice and greed.

195.     Hamad had confidential expert and customer contact lists belonging to AME in his possession, and Hamad used this information to attempt to lure away at least one of AME's customers.

196.     Such use by Hamad comprises wrongfully exerting control over the information in a manner inconsistent with AME's interests.

197.     AME suffered damages in an amount to be proved at trial but at least $250,000.

198.     Defendants converted everything needed to build PME from AME, including AME's website, AME's expert database, AME's client contacts, AME's internal business processes, AME's vendor list, AME's advertising channels, etc.  Essentially, the entire business now embodied in PME was unlawfully converted from AME.

199.     As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

200.     AME is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, PME will continue to use AME's trade secrets and confidential and proprietary information that Hamad purloined from AME.

201.     AME is entitled to permanent injunctive relief to restrain and enjoin Defendants' continued conduct.

202.     It would be difficult to remove those elements belonging to AME from PME as nothing was developed for the business of PME without the use of AME's trade secrets and confidential and proprietary information.

203.     As Hamad has copied, misappropriated or stolen the entire business embodied in PME from AME, Plaintiff is entitled to the entire business of PME; hence Plaintiff is entitled to an order transferring the entire right, title and interest, in and to PME to Plaintiff, including but not limited to the telephone number associated with PME, the website and the email domain.

## SIXTH CLAIM FOR RELIEF

### Misappropriation of Trade Secrets

### in Violation of Virginia Uniform Trade Secrets Act (Hamad)

204.     AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 203 above and incorporates them by reference.

205.     AME's customer lists and expert databases derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

206.     AME's customer lists and expert databases are not known or readily ascertainable by proper means.

207.     AME goes to reasonable means to maintain the secrecy of AME's customer list and expert databases, including but not limited to limiting access to such information and providing computer secrecy protection for these trade secrets.

208.     AME's trade secrets have been developed over 3 decades and as such comprise highly valuable assets that cannot be easily created by a new competitor, such as PME.

209.     AME undertakes efforts to maintain this information unto itself and secret, for its access to these experts, for example, that AME sells to its customers of lawyers and insurance companies on a regular basis.

210.     Hamad acquired, disclosed, and/or used AME's trade secrets developed by the AME through improper means, namely, without express or implied consent, to build PME.

211.     Hamad knew or had reason to know that Hamad's knowledge of AME's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy.

212.     Jane Doe and/or John Doe knew or had reason to know that AME's trade secrets were acquired by Hamad under circumstances giving rise to a duty to maintain its secrecy or derived through Hamad who owed such a duty to AME.

213.     As a result of Hamad's theft of trade secrets in violation of the Virginia Uniform Trade Secrets Act (VUTA), PME was able to rapidly develop a competing business to AME.

214.     AME's damages include PME's unjust enrichment caused by misappropriation that is not taken into account in computing actual loss pursuant to Virginia Code 59.1-338(A).

215.     As a result of Defendant's misappropriation of AME's trade secrets, AME suffered actual damages in an amount to be proved at trial.

216.    Hamad's misappropriation of AME's trade secrets was willful and malicious.

217.    AME is entitled to punitive damages in an amount not exceeding twice any actual damage award or reasonable royalty, or $350,000 whichever amount is less pursuant to Virginia Code 59.1-338(B).

218.    AME is entitled to its reasonable attorneys' fees pursuant to Virginia Code § 59.1-338.1.

219.    AME requests enjoinment of PME's actual misappropriation for at least five years, which is a reasonable period of time, to eliminate PME's commercial advantage that otherwise would be derived from the misappropriation pursuant to Virginia Code § 59.1-337.

220.    AME assets that PME's misappropriation of AME's trade secrets constitutes exceptional circumstances because PME has been able to rapidly create a competing business that it would not have been able to do without acquiring the knowledge from the misappropriation thereby rendering a prohibitive injunction inequitable.

221.    AME is entitled to a reasonable royalty for Defendants' misappropriation pursuant to Virginia Code § 59.1-338(A).

222.    As such, AME requests this court condition future use of AME's trade secrets by PME upon payment of a reasonable royalty for at least the period of time for which use could have been prohibited.

223.    AME asserts that a reasonable royalty would be at least $250,000 per year.

## SEVENTH CLAIM FOR RELIEF

### Violation of Virginia Computer Crimes Act 18.2-152.4 and 152.12 (Hamad)

224.    AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 223 above and incorporates them by reference.

225.    Upon information and belief, Hamad used a computer without authority to intentionally transfer confidential information and proprietary documents belonging to AME from AME's internal computer system to Hamad's personal electronic storage devices and Hamad's personal e-mail account while for the past 18 months, Hamad stealing AME's trade secret, while being paid handsomely.

226.    Upon information and belief, Hamad transferred AME'S confidential information and proprietary documents without AME's authorization to his personal electronic storage devices and his personal e-mail account.

227.    Hamad knew or reasonably should have known that Hamad had no right, agreement, or permission to copy AME's trade secrets, confidential and proprietary information to use such information to compete with AME by forming PME by using such information.

228.    Hamad acted in a manner knowingly exceeding such any right, agreement, or permission granted to Hamad by AME by copying and using such information to compete with AME by forming PME with such information.

229.    Hamad did so with the intent to obtain AME's trade secrets, confidential and proprietary information by embezzlement, by committing larceny, and grand larceny, and/or converting AME's property.

230.    While working for AME, Hamad with malicious intent or through intentionally deceptive means and without authority, used his computer to make or cause to be made an unauthorized copy of AME's computer data, including but not limited to AME's emails, AME's customer contact information, AME'S expert database, AME's confidential information, such as AME's form emails, and AME's customer intake forms, for both leads and experts, in violation of Virginia Code 18.2-152.4.

231.    AME was damaged as a result of Hamad's violation of Va. Code 18.2-152.4.

232.    AME is entitled to damages sustained from Hamad's violation of Va. Code 18.2-152.4, which damages include at least lost profits, and costs.

233.    AME asserts that its lost profits are PME's profits; hence AME is entitled to PME's profits.

## EIGHTH CLAIM FOR RELIEF

### Common Law Conspiracy (Hamad and John and Jane Doe)

234.    AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 233 above and incorporates them by reference.

235.    Hamad and John Doe and/or Jane Doe combined as PME, in concerted action, to plagiarize and/or copy Plaintiff's website in violation of the Copyright Act to accomplish the unlawful purpose of injuring Plaintiff's business.

236.    Upon information and belief, John Doe and/or Jane Doe worked with Hamad to create PME's website and to run PME operations on a daily basis.

237.    Upon information and belief, John Doe and/or Jane Doe plagiarized the content, look and feel and overall operation of AME's website to create PME's website.

238.    Upon information and belief, Hamad and John Doe and/or Jane Doe combined, by some concerted action, to misappropriate Plaintiff's trade secrets and/or Plaintiff's confidential and proprietary information in violation of the Virginia Uniform Trade Secrets Act to accomplish the unlawful purpose of injuring Plaintiff's business.

239.    Upon information and belief, Hamad and John Doe and/or Jane Doe combined, by some concerted action, to form PME by unlawful means, including one or more of the following: (i) misappropriating Plaintiff's trade secrets and/or Plaintiff's confidential and

proprietary information in violation of the Virginia Uniform Trade Secrets Act to the benefit of PME; (ii) unlawfully converting AME's trade secrets and/or confidential and proprietary information to the benefit of PME; (iii) violating Hamad's fiduciary duty to AME, Hamad's duties of loyalty, good faith and fair dealing to AME to the benefit of PME; and (iv) violating Hamad's employment agreements with AME to not compete and not disclose company confidential information to the benefit of PME.

240. Hamad and John Doe and/or Jane Doe combined, by some concerted action, to form PME by unlawful means, including plagiarizing and/or copying Plaintiff's website in violation of the Copyright Act.

241. Hamad and John Doe and/or Jane Doe combined to create PME's website, which was unlawfully plagiarized from AME's website in violation of the Copyright Act.

242. Hamad and John Doe and/or Jane Doe combined to form PME to compete with AME using AME's trade secrets and AME's proprietary and confidential information in violation of Hamad's non-compete agreement with AME and Hamad's non-disclosure agreement with AME.

243. Hamad and John Doe and/or Jane Doe combined to create PME using AME's trade secrets that Hamad misappropriated from AME in violation of the Virginia Uniform Trade Secrets Act.

244. Hamad in combination with Jane Doe and/or John Doe conspired to breach Hamad's fiduciary, contractual, employment, and other duties to AME, including unlawful conversion by them of AME's confidential and proprietary information.

245. Hamad and John Doe and/or Jane Doe acted in concert to damage AME's business intentionally, maliciously and without lawful justification through Hamad's breach of

fiduciary and employment duties.

246.     As a result of this business conspiracy by Hamad and Jane Doe and/or John Doe, AME suffered damages in an amount to be proved at trial, but at least the loss of business to PME, the loss of valuable trade secrets to PME and the loss of AME's proprietary and confidential information to PME.

247.     AME was damaged as a result of the illegal conspiracy to form PME to compete with AME and harm AME's business in an amount to be proved at trial, but at least $350,000.

## NINTH CLAIM FOR RELIEF

### Conspiracy in Violation of Va. Code 18.2-499-500 (Hamad and John and Jane Doe)

248.     AME hereby restates and re-alleges the allegations set forth in paragraphs 1 through 247 above and incorporates them by reference.

249.     Hamad and John Doe and/or Jane Doe combined for the purpose of willfully and maliciously injuring AME's business in violation of Virginia Code 18.2-499 and -500.

250.     Hamad and John Doe and/or Jane Doe combined to perform an unlawful act or for an unlawful purpose as set forth above.

251.     Hamad and John Doe and/or Jane Doe combined to create PME's website, which was unlawfully plagiarized from AME's website in violation of the Copyright Act.

252.     Hamad and John Doe and/or Jane Doe combined to form PME to compete with AME using trade secrets and AME proprietary and confidential information in violation of Hamad's non-compete agreement with AME and Hamad's non-disclosure agreement with AME.

253.     Hamad and John Doe and/or Jane Doe combined to create PME using misappropriated trade secrets in violation of the Virginia Uniform Trade Secrets Act.

254.     Hamad in combination with Jane Doe and/or John Doe conspired to breach

Hamad's fiduciary, contractual, employment, and other duties to AME, including unlawful conversion by them of AME's confidential and proprietary information.

255.     Hamad and John Doe and/or Jane Doe acted in concert to damage AME's business intentionally, maliciously and without lawful justification through breach of fiduciary and employment duties.

256.     As a result of this business conspiracy by Hamad and Jane Doe and/or John Doe, AME suffered damages in an amount to be proved at trial, but at least the loss of business to PME, the loss of valuable trade secrets to PME and the loss of AME's proprietary and confidential information to PME.

257.     AME was damaged as a result of the illegal conspiracy to form PME to compete with AME and harm AME's business in an amount to be proved at trial, but at least $350,000.

258.     AME is entitled to a permanent injunction restraining and enjoining Defendants from continuing to operate PME using trade secrets of AME, confidential and proprietary information of AME, and operating a website infringing the copyrights of AME, pursuant to 18.2-500.

259.     AME is entitled to its costs of suit, and reasonable counsel fees pursuant to Va. Code 18.2-500.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against each of the Defendants jointly and severally as follows:

A.  Entry of judgment in favor of Plaintiff against Defendants jointly and severally;

B.  With respect to Counts I and II (Copyright Violations):

     1.     A declaration that Defendants willfully infringed Plaintiff's copyright;

2.     For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Defendants' willful violations of Plaintiff's rights under the Copyright Act or, in the alternative, at Plaintiff's election pursuant to 17 U.S.C. § 504(b), Plaintiff's actual damages, including PME's profits from the infringements, in an amount to be proven at trial;

3.     An order awarding AME statutory and/or actual damages for each instance in which PME copied AME's website pursuant to 17 U.S.C. §§ 1201(a)(1) and 1203;

4.     An order awarding AME its actual damages resulting from Defendants continued copyright infringement, as well as PME's profits attributable to the continuing copyright infringement to the extent not duplicative of actual damages;

5.     An order for an accounting of all gains, profits, cost savings and advantages realized by PME from its acts;

6.     An order preliminarily and permanently enjoining PME, its officers, agents, servants, consultants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of infringement of AME's copyrights; and

7.     An order awarding AME its costs and attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203, or other applicable law.

C.   With respect to Counts III (Breach of Contract), IV (Breach of Fiduciary Duty), V (Conversion), VI (Misappropriation of Trade Secrets), and VII (Violation of VCCA):

1.   An order preliminarily and permanently enjoining PME, its officers, agents, servants, consultants, employees, attorneys, and affiliated companies, its assigns and successors

in interest, and those persons in active concert or participation with them, from continued use of AME's trade secrets and other confidential and proprietary information belonging to AME;

   2.   An order transferring all rights, titles and interests in, and to PME to AME, including PME's domain, website, email domain, and telephone number.

   3.   An award of lost profits of AME in an amount proven at trial;

   4.   An award of PME's profits in an amount proven at trial;

   5.   A reasonable royalty in the amount of $250,000 per year; and

   D.   With respect to Counts VIII (Common Law Conspiracy) and IX (Virginia Statutory Conspiracy):

   1.   Punitive Damages in the maximum amount allowed under Virginia law, or $350,000 whichever is greater;

   2.   Damages proved at trial and sustained by AME, but at least $350,000;

   3.   Three-fold the damages proved at trial and sustained by AME pursuant to Virginia Code 18.2-500;

   4.   An order awarding AME its costs and attorneys' fees pursuant to Virginia Code 18.2-500(A), or other applicable law; and

   5.   An order preliminarily and permanently restraining and enjoining Defendants from continuing to operate PME using trade secrets, and confidential and proprietary information of AME pursuant to 18.2-500; and an order restraining Defendants from aiding and abetting similar business of that AME's;

   E. Prejudgment and post-judgment interest;

   F. All such further and additional relief, in law or equity, to which AME may be entitled or which the Court deems just and proper.

Respectfully Submitted.

Dated: September 11, 2020          /s/ Michael P. Fortkort
                                         Virginia Bar No. 36,858

**MICHAEL P FORTKORT PC**
The International Law Center
13164 Lazy Glen Lane
Oak Hill, Virginia 20171
703-435-9390 (direct)
703-991-9109 (facsimile) mfortkort@fortkort.com

**ATTORNEYS FOR PLAINTIFF AMERICAN
MEDICAL EXPERTS, LLC**

## DEMAND FOR JURY TRIAL

AME hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.


Dated: September 11, 2020                   /s/ Michael P. Fortkort
                                            Virginia Bar No. 36,858

                                            **MICHAEL P FORTKORT PC**
                                            The International Law Center
                                            13164 Lazy Glen Lane
                                            Oak Hill, Virginia 20171
                                            703-435-9390 (direct)
                                            703-991-9109 (facsimile) mfortkort@fortkort.com

                                            **ATTORNEYS FOR PLAINTIFF AMERICAN
                                            MEDICAL EXPERTS, LLC**

**EXHIBIT A – AME WEBSITE COPYRIGHT REGISTRATION CERTIFICATE**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-849-518

**Effective Date of Registration:**
March 03, 2020
**Registration Decision Date:**
March 09, 2020

## Title

| | |
|---|---|
| **Title of Work:** | American Medical Experts Website |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2018 |
| **Date of 1st Publication:** | January 01, 2018 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| **• Author:** | Howard Eric Jacobs |
| **Author Created:** | text |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |
| **Year Born:** | 1972 |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | American Medical Experts |
| | 25448 Fritz CT, Aldie, VA, 20105, United States |
| **Transfer statement:** | By written agreement |

## Limitation of copyright claim

| | |
|---|---|
| **Material excluded from this claim:** | previous version |
| **New material included in claim:** | new and revised text |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | American Medical Experts |
| **Name:** | Howard Eric Jacobs |
| **Email:** | ej7@aol.com |
| **Telephone:** | (703)932-7777 |

**EXHIBIT B – NON-DISCLOSURE AND TERMINATION AGREEMENT**

## NON-DISCLOSURE AND TERMINATION AGREEMENT

State of Virginia

County of Loudoun

This AGREEMENT is made on March 7, 2015 by and between American Medical Experts, LLC at 25448 Fritz CT, Aldie, VA 20105 and Ronny Hamad, as a contractor, at 25642 Balint Park Court Aldie, VA 20105.

1.      American Medical Experts, LLC is, among other things, engaged in Medical Legal Consulting – American Medical Experts, LLC assists attorneys in reviewing cases for medical malpractice and personal injury cases (both plaintiff and defense) as well as individuals that are in need of assistance for case reviews, Expert Witness Reports and expert witnesses on those cases.

2.      The sensitivity of the material (medical records, personal and confidential case information, etc.) and Ronny Hamad agrees that this information is private and confidential and not to be disclosed to anyone outside American Medical Experts, LLC.

3.      American Medical Experts, LLC, through its representatives and advertising media, has developed a large and extensive trade with a substantial number of clients which are of great value to American Medical Experts, LLC; and

4.      Ronny Hamad agrees that the covenants, agreements and restrictions (hereinafter "this covenant") contained herein are necessary to protect the business goodwill, business interests, business practice and proprietary rights of American Medical Experts, LLC.

5.      Nondisclosure.    At all times Ronny Hamad shall refrain from disclosing to anyone outside of American Medical Experts, LLC any and all of American Medical Experts, LLC customer lists, expert witnesses, trade secrets, and other proprietary or confidential information pertains to American Medical Experts, LLC.

6.      Non-Compete.  Ronny Hamad agrees that for a period of five years immediately following the termination (March 7, 2015), Ronny Hamad will not directly or indirectly work in the same or similar field for himself or on behalf of any other person, partnership, corporation, or association; Ronny Hamad will not disclose trade secrets, special training, clients, business model/secrets, or proprietary rights of the American Medical Experts, LLC which Ronny Hamad learned or became aware of during Contracting work with American Medical Experts, LLC.

7.      This Agreement shall be construed and performed according to the laws of the State of Virginia excluding its conflicts of law rules.

8.      If any provision of this Agreement shall be held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired thereby and, if possible, any invalid, illegal or unenforceable provision shall be limited or interpreted to the minimum extent necessary to cure its defect.  The parties hereto have independently discussed, reviewed and had the opportunity of legal counsel to consider this agreement.

**American Medical Experts, LLC:**

By: _____          Date: ___3-7-15___

[Eric Jacobs - President/Owner]


By: _____          Date: ___3/7/2015___

[Ruba Agha - Jacobs Co-Owner]


By: _____          Date: ___3/7/15___

[Ronny Hamad – Contractor]

**EXHIBIT C – NON-DISCLOSURE AND EMPLOYMENT/CONTRACTOR AGREEMENT**

**NON-DISCLOSURE AND EMPLOYMENT/CONTRACTOR AGREEMENT**

State of Virginia
County of Loudoun

This AGREEMENT is made on March 8, 2015 by and between American Medical Experts, LLC at 25448 Fritz CT, Aldie, VA and Ronny Hamad, as a contractor, residing at 25642 Balint Park Court Aldie, VA 20105.

1.      American Medical Experts, LLC is, among other things, engaged in Medical Legal Consulting – AME assists attorneys in reviewing cases for medical malpractice and personal injury cases (both plaintiff and defense) as well as individuals that are in need of assistance and supplies expert witnesses on those cases.

2.      The sensitivity of the material (medical records, personal and confidential case information, etc.) and Ronny Hamad agrees that this information is private and confidential and not to be disclosed to anyone outside American Medical Experts, LLC.

3.      American Medical Experts, LLC, through its representatives and advertising media, has developed a large and extensive trade with a substantial number of clients which are of great value to American Medical Experts, LLC; and

4.      Ronny Hamad agrees that the covenants, agreements and restrictions (hereinafter "this covenant") contained herein are necessary to protect the business goodwill, business interests, business practice and proprietary rights of American Medical Experts, LLC.

5.      Nondisclosure**.**    At all times Ronny Hamad shall refrain from disclosing to anyone outside of American Medical Experts, LLC any and all of American Medical Experts, LLC customer lists, expert witnesses, trade secrets, and other proprietary or confidential information.

6.      Non-Compete.  Ronny Hamad agrees that for a period of Five (5) years during employment / contractor work and also immediately following termination, Ronny Hamad will not directly or indirectly work in the same or similar field for himself or on behalf of any other person, partnership, corporation, or association; Ronny Hamad will not disclose trade secrets, special training, clients, business model/secrets, or proprietary rights of the American Medical Experts, LLC which Ronny Hamad learned or became aware of during Contractor's employment with the American Medical Experts, LLC.

7.      This Agreement shall be construed and performed according to the laws of the State of Virginia excluding its conflicts of law rules.

8.      If any provision of this Agreement shall be held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired thereby and, if possible, any invalid, illegal or unenforceable provision shall be limited or interpreted to the minimum extent necessary to cure its defect.  The parties hereto have independently discussed, reviewed and had the opportunity of legal counsel to consider this agreement.

9.      Compensation.  American Medical Experts and Ronny Hamad has agreed to compensate Ronny Hamad a tier structured payment agreement (as follows):

| Income | Incremental Tier | | |
|---|---|---|---|
| Sub-Net | Percentage | Bi-weekly Pay | Annual Pay |
| 32500 | 6 | 1,950 | 50,700 |
| 35000 | 6.1 | 2,135 | 55,510 |
| 37500 | 6.2 | 2,325 | 60,450 |
| 40000 | 6.3 | 2,520 | 65,520 |

| 42500 | 6.4 | 2,720 | 70,720 |
| 45000 | 6.5 | 2,925 | 76,050 |
| 47,500 | 6.6 | 3,135 | 81,510 |
| 50,000 | 6.7 | 3,350 | 87,100 |
| 52,500 | 6.8 | 3,570 | 92,820 |
| 55,000 | 6.9 | 3,795 | 98,670 |
| 57,500 | 7 | 4,025 | 104,650 |
| 60,000 | 7 | 4,200 | 109,200 |

Expectations:

- Work schedule: 8am to 5pm minimum and after hours as needed

- Answering phone calls after hours and on weekends, using AME phone

  - Send a text to Eric about new inquiries as soon as an inquiry comes in

  - Get new inquiries processed as soon as you get access to computer that day

  - Keep Eric in the loop on all inquiries and new leads after hours or on weekends

- Sending 100 emails minimum once a day (business days)

  - Or setup draft emails on weekends but send on a business day on Monday

- 20% for emails acquired by Ronny and without compromising the general work on other cases

- Great Attitude, Gratitude, Appreciation, Positive Energy, Hard work, and great sense of humor (that's a must)


**American Medical Experts, LLC:**


By: _____          By_____
[Eric Jacobs President/Owner]      Date          [Ruba Agha Jacobs Co-Owner]      Date


**Contractor:**


By: _____
Ronny Hamad          Date

**EXHIBIT D – VIRGINIA STATE CORPORATION ORGANIZATION CERTIFICATE
FOR MEDLAW CONSULTING GROUP LLC (NOW PME)**



# COMMONWEALTH OF VIRGINIA
## STATE CORPORATION COMMISSION

### Office of the Clerk

June 17, 2018

RONNY HAMAD
25642 BALINT PARK CT
ALDIE, VA 20105

### RECEIPT

RE: MedLaw Consulting Group LLC

ID: S7593405

DCN: 18-06-17-5291

Dear Customer:

This is your receipt for $100.00 to cover the fee(s) for filing articles of organization for a limited liability company with this office.

The effective date of the filing is June 17, 2018.

If you have any questions, please call (804) 371-9733 or toll-free in Virginia, (866) 722-2551.

Sincerely,

*Joel H. Peck*

Joel H. Peck
Clerk of the Commission

RECEIPTLC
LLNCD
CISECOM

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, JUNE 17, 2018

The State Corporation Commission has found the accompanying articles submitted on behalf of

MedLaw Consulting Group LLC

to comply with the requirements of law, and confirms payment of all required fees.  Therefore, it is ORDERED that this

# CERTIFICATE OF ORGANIZATION

be issued and admitted to record with the articles of organization in the Office of the Clerk of the Commission, effective June 17, 2018.

STATE CORPORATION COMMISSION

By *Mark C. Christie*

Mark C. Christie
Commissioner

DLLCACPT
CISECOM
18-06-17-5291

# ARTICLES OF ORGANIZATION
## OF
## MEDLAW CONSULTING GROUP LLC

The undersigned, pursuant to Chapter 12 of Title 13.1 of the Code of Virginia, states as follows:

1.    The name of the limited liability company is MedLaw Consulting Group LLC.

2.    The purpose for which the limited liability company is formed is to engage in any lawful business, purpose or activity for which a limited liability company may be formed under the Virginia Limited Liability Company Act.

3.    The name of the limited liability company's initial registered agent is Ronny Hamad.  The initial registered agent is an individual who is a resident of Virginia and a member or manager of the limited liability company.

4.    The address of the limited liability company's initial registered office, which is identical to the business office of the initial registered agent, is 25642 Balint Park Ct, Aldie, VA 20105.  The initial registered office is located in Loudoun County, Virginia.

5.    The address of the limited liability company's principal office where the records of the limited liability company are to be kept is 25642 Balint Park Ct, Aldie, VA 20105.

ORGANIZER:

/s/     Ronny Hamad   Date: June 17, 2018
         Ronny Hamad



| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 01/29/2020 | 01/29/2020 | 200129283376 | 202001290315339-14057460 | Articles of Amendment | Approved | Name Change | Online | 1 | |
| 06/17/2018 | 06/17/2018 | 1806175291 | 1806540449 | Articles of Organization | Approved | N/A | In-House | 3 | |

Page 1 of 1, records 1 to 2 of 2

Filing Date Snapshot as of: 1/29/2020

| Business Details | **Name Changes** | Principal Office | Principals |
|---|---|---|---|

| Date | Name Type | Name |
|---|---|---|
| 01/29/2020 | Legal Name | Prime Medical Experts LLC |
| 06/17/2018 | Former Name | MEDLAW CONSULTING GROUP LLC |

Back    Return to Search    Return to Results

Back to Login

**EXHIBIT E – BETTER BUSINESS BUREAU LISTING FOR PME SHOWING EXISTENCE SINCE JUNE 17, 2018**



# Better Business Bureau®

| Find | businesses, charities, category | Near | Aldie, VA | ✕ | ⬛ US ⌄ | **Search** |



📍 My BBB   ☰

BBB remains operational and focused on serving our community and our consumers throughout this crisis. Please check our resources available to you at **BBB.org/coronavirus**. Some of the sources of information BBB relies on are temporarily unavailable. Also, many businesses are closed, suspended, or not operating as usual, and are unable to respond to complaints and other requests. BBB information and Business Profiles reflect the most current information available to us. We appreciate your patience as we and everyone in our communities focus on addressing this crisis.   ✕

Home > Virginia > Aldie > Litigation Support > Prime Medical Experts



## Prime Medical Experts

Litigation Support

Medical Litigation Support, Case Overview, Expert Witness Opinion & Reports, Independent Medical Exams, Experts, Resources

📍 25642 Balint Park Ct
Aldie, VA 20105-2547

🔗 http://www.primemedicalexperts.com

✉ Email this Business

📞 (703) 717-3292

⌷ 🖨

---

### BBB Rating & Accreditation



🛡 **ACCREDITED BUSINESS**   **A-**

Accredited Since: 4/15/2020
Years in Business: 2
Customer Reviews are not used in the calculation of BBB Rating

Reasons for BBB Rating

### Customer Reviews

⭐⭐⭐⭐⭐

Average of 7 Customer Reviews

Start a Review

**Read Reviews**



Want a quote from this business?

**Get a Quote**

---

## Overview

Medical Litigation Support, Case Overview, Expert Witness Opinion & Reports, Independent Medical Exams, Experts, Resources

## Business Details

**Location of This Business**
25642 Balint Park Ct, Aldie, VA 20105-2547
✉ Email this Business

**BBB File Opened:** 2/28/2020
**Years in Business:** 2
**Business Started:** 6/17/2018
**Business Started Locally:** 6/17/2018
**Business Incorporated:** 6/17/2018
**Accredited Since:** 4/15/2020
**Type of Entity:** Limited Liability Company (LLC)

**Alternate Business Name**
Prime Medical Experts LLC

**Business Management**
Mr. Ronny Hamad, Director

**Contact Information**
Principal
Mr. Ronny Hamad, Director
Customer Contact
Mr. Ronny Hamad, Director

**Additional Contact Information**
Email Addresses
Email this Business   Primary
Email this Business   Sales
Email this Business   Technical Support
Email this Business   Customer Service

Read More Business Details

## Customer Complaints

1 Customer Complaints

**Need to file a complaint?** BBB is here to help. We'll guide you through the process. How BBB Processes Complaints and Reviews

**File a Complaint**

Most Recent Customer Complaint
**Complaint Type:** Problems with Product/Service   **Status:** Answered ❓
06/10/2020

👤   Complaint Details Unavailable

## Customer Reviews

7 Customer Reviews

**What do you think? Share your review.**
How BBB Processes Complaints and Reviews

**Start a Review**

Most Recent Customer Review
👤 Blane M
⭐⭐⭐⭐⭐   08/25/2020

Prime Medical Experts exceeded my expectations, by providing meaningful medical evaluation with a quick turnaround, at a fair price. I expect to use Prime Medical Experts again in future cases.

👤 Prime Medical Experts Response   08/27/2020

Thank you for your trust in our service. It was a pleasure assisting you.

Read 6 More Customer Reviews

## Business Categories

Litigation Support   Investigator

## Local BBB

BBB serving Metro Washington DC, Metro Philadelphia & Eastern Pennsylvania

More Info on Local BBB

## BBB Reports On

BBB reports on known marketplace practices.

**See What BBB Reports On**

---

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.



**For Consumers**
Search for a Business
Get a Quote
Start a Review
File a Complaint
BBB Scam Tracker
File an Auto Warranty Complaint
BBB Ad Truth
Sign up for Scam Alerts
Frequently Asked Questions (FAQ)

**For Businesses**
Search Business Profiles
Get Accredited
BBB EU Privacy Shield

**About BBB**
BBB Directory
Give.org
BBB Institute for Marketplace Trust
International Association of Better Business Bureaus
Contact
BBB Business Partner Code
Mission & Vision
BBB National Programs

**EXHIBIT F – SIDE BY SIDE COMPARISON OF AME'S WEBSITE AND PME'S WEBSITE**

AME and PME look & feel comparison

*Note: New version of PME on top, then* older version *is* highlighted *right below it.*

Independent Medical Evaluation Page

| AME | PME (new version) |
|-----|-------------------|



| AME | PME (Older version) |
|-----|---------------------|



Expert Witness Report Page

AME

PME (new version)



AME

PME (Older version)



About us Page

## AME

## PME (new version)



## AME

## PME (Older version)



Free Summary Review Page

### AME

### PME (new version)



### AME

### PME (Older version)



AME Home Page & PME Services Page

AME

PME (new version)



AME

PME (Older version)



**EXHIBIT G – COMPARISON OF TEXT COPIED FROM AME'S WEBSITE WITH PME'S WEBSITE**

]

**Table 1**

| AME's Website | PME's Website |
|---|---|
| *"HOME" Page* | *"ABOUT US" Page* |
| AME is a unique expert witness service that obtains the opinion and a report by an expert witness at the most competitive rates, starting at $995. This rate will get you the answers in a written report (or verbal opinion) on your case from a specialist that you need to know.  Let AME save you time and money for all your Expert Witnesses and use our Free Case Summary Review to get you one step closer to all your answers. | Prime Medical Experts is a full expert witness service that offers a unique fee schedule in order to contain the cost on the case until you get the answers that you need. If the opinion is supportive or helpful then it is worth paying an additional fee to finalize the report/CV, etc.<br><br>Prime Medical Experts is a full expert witness service that provides expert witness opinions in medical malpractice, personal injury, workers compensation, auto accident and all other types of cases at the most reasonable rates in the industry. |
| *"Expert Witness Reports" Page* | *"Expert Witness Opinion" Page* |

| STEP 1 – Expert Witness Report | PHASE 1 - EXPERT WITNESS OPINION |
|---|---|
| $995 | $800 |
| • Up to 100 pages reviewed of medical records as a confidential work product report – (step 1 of our 2-step process) | • Up to 100 pages of medical records |
| • $1.75 for each additional page of medical records | • $1.50 per page over 100 |
| • $3 – $6 for the review of deposition transcripts, research material as well as x-ray images. | • $2-$5 per page of non-medical records or images (deposition transcripts, answers to interrogatories, etc.) |
| • The review of items on CD (x-ray, MRI, CTs, etc.) ranges from $100 – $700 per CD. | • $100-$600 per imaging CD |
| • | |
| [Note PME reduced pricing when compared to AME, to compete and harm AME: $800, $1.50, $2-$5, and $100-$600 respectfully] | [Note PME reduced pricing when compared to AME, to compete and harm AME: $800, $1.50, $2-$5, and $100-$600 respectfully] |
| STEP 2  (Only paid if you have a supportive opinion and/or need the name, CV and signed report) | PHASE 2 – SIGNED REPORT / CV / REFERRAL |
| Please note that

if an expert is unable to formulate an accurate opinion based on the records/material provided and requires to conduct additional research to obtain necessary information to render an opinion or answer specific questions by the client, our standard two-step | If an expert is unable to formulate an accurate opinion based on the records/material provided for their initial review and requires to conduct additional research to obtain the necessary information to formulate an opinion or |

| | |
|---|---|
| process and our reduced rate may not apply, <u>and additional fees will be required.</u> This scenario would be subject to a <u>different fee schedule</u> and <u>determined on a case by case basis</u>. Please call for details, see section (***) below for more information. | <u>answer specific questions by the client,</u> this is considered additional work which is outside of our fee schedule, <u>and additional fees will be required</u> at either an hourly rate or <u>different fee schedule.</u> The hourly rate/fee schedule is <u>determined on a case by case basis</u>. |
| <u>If a specific request such as the location, school affiliation, and cases that have very specific report requirements such as Federal Cases, etc., of an expert, our reduced fee schedule may not apply.</u> | <u>If a specific request such as the location, school affiliation, and cases that have very specific report requirements such as Federal Cases, etc., of an expert, our reduced fee schedule may not apply.</u> |
| As you know, American <u>Medical Experts, LLC cannot guarantee the availability of</u> the experts as well as the opinions of any expert, how well they will do under cross-examination, or how they will do in deposition or trial testimony and we cannot guarantee their level of future cooperation. | Prime <u>Medical Experts, LLC cannot guarantee the availability of</u> and expert witness after we disclose them to you. We are not involved with anything beyond the initial review and final signed report or product requested. |
| <u>The retaining attorney is expected to</u> furnish <u>all relevant documents and materials to the expert witness directly as they</u> are obtained | <u>The retaining</u> client, whether the attorney or pro se litigant acting as their own <u>attorney is expected to provide all the</u> |

| | |
|---|---|
| and to provide all requested documents, materials and examinations as discovery rules permit; this is not the responsibility of American Medical Experts. | relevant records and materials to the expert witness directly as they become available and to provide all requested documents, materials and examinations as discovery rules permit; this is not the responsibility of Prime Medical Experts. |
| In the event that you decide not to proceed with a review … a minimum processing fee of $295 per expert witness requested or review, plus any transaction fees that were associated with the transfer of funds. | There is a processing fee of $200 for any case that was submitted to PME and for whatever reason never went forward, such as sending the records, canceling the review, etc… |
| *"Free Case Summary Review" Page* | *"Free Summary Review" Page* |
| Free Case Summary Review BBB Accredited Business A+ Rating | Free Summary Review BBB Rating A- |
| Resources (drop down menu)<br><br>How to Send a Case<br><br>Expert Witness Directory<br><br>Expert Witness Repository<br><br>Become an Expert | Resources (drop down menu)<br><br>How to Send a Case<br><br>Specialty Directory<br><br>Full List of Specialties<br><br>Client Testimonials |
| Expert Services (drop down menu)<br><br>Veteran Nexus Letters<br><br>Expert Witness Reports | Services (drop down menu)<br><br>Case Overview<br><br>Expert Witness Opinion |

| | |
|---|---|
| <u>Complete Case </u>Review<br><br><u>Independent Medical E</u>valuations (IMEs)<br><br>Patients & Families<br><br>Fee Schedule | <u>Expert Witness Report</u><br><br><u>Independent Medical Exam</u> |
| <u>The Free Case Summary Review is </u><u>helpful</u><br><u>in lining up the right experts and getting</u><br><u>feedback</u> from the specialists prior to the<br>record review <u>on</u> your <u>case.</u><br><br><u>For this </u>free <u>service, please</u> complete and<br><u>submit the intake form below</u> so we can<br>share <u>your</u> detailed <u>summary</u> with experts<br>right away.<br><br>[note intake form almost identical to AME] | <u>The Free Summary Review is </u>a great<br>option to <u>help</u> <u>line up the right expert(s)</u><br><u>and get some feedback on a</u> possible<br><u>case.</u><br><br><u>For this service, </u>…<br><br><u>Please </u>fill out <u>the intake form below </u>to<br>start <u>your </u>free <u>summary </u>review today<u>.</u><br><br>[note intake form almost identical to<br><br>AME] |
| *"Independent Medical Evaluations (IMEs)"*<br>*Page* | *"Independent Medical Exam" Page* |
| For over 3 decades, the Directors <u>at</u><br>American <u>Medical Experts, LLC </u><u>have been</u><br><u>assisting law firms, pro se</u><br><u>litigants/individuals, and insurance</u><br><u>companies in the location and scheduling of</u><br><u>Independent Medical Examinations (IMEs)</u><br><u>across the county.</u><br><br>[Note the copying of the typographical<br>error, last word, "county" should be<br>"country".  Missing the R in Country.] | <u>At</u> Prime <u>Medical Experts, LLC </u>we <u>have</u><br><u>been assisting law firms, pro se</u><br><u>litigants/individuals, and insurance</u><br><u>companies in the location and scheduling</u><br><u>of Independent Medical Examinations</u><br><u>(IMEs) across the county.</u><br><br>[Note the copying of the typographical<br>error, last word, "county" should be<br>"country".  Missing the R in Country.] |

| | |
|---|---|
| From <u>slip and fall cases,</u> car <u>accidents,</u> <u>workers compensation claims, medical</u> <u>insurance claims, veteran's claim cases,</u> <u>long-term injury, causation, damages, and all</u> <u>defense cases to assisting legal counsel,</u> <u>insurance companies and their clients with</u> <u>the most qualified expert witnesses.</u> | We work on all types of cases that requires IMEs such as <u>slip and fall cases,</u> auto <u>accidents, workers compensation claims,</u> <u>medical insurance claims, veteran's claim</u> <u>cases, long-term injury, causation,</u> <u>damages, and all defense cases to assisting</u> <u>legal counsel, insurance companies and</u> <u>their clients with the most qualified expert</u> <u>witnesses.</u> |
| **<u>Cancellation policy:</u> Unless otherwise specified differently on an invoice, our <u>general cancellation policy for an IME</u> if records have not been sent to the expert, <u>if</u> <u>canceled 2 weeks prior to the date of the</u> <u>IME, the refund is 50%</u> and <u>if cancelled if</u> one 1 <u>week in advance of the IME</u> there is no <u>refund. If records have been sent to the</u> <u>expert, there is no refund as the work / review</u> <u>as begun.</u> [Note the copying of the typographical error where "as begun" should be "has begun"]. | <u>Cancellation policy:</u> *The <u>general</u>* <u>*cancellation policy for an IME*</u>, <u>if</u> <u>cancelled</u> within <u>2</u> business <u>weeks prior to</u> <u>the date of</u> a scheduled <u>IME, the refund is</u> <u>50%. If cancelled</u> within <u>1</u> business <u>week</u> <u>in advance of the IME, there is no refund.</u> <u>If records have been sent to the expert,</u> <u>there is no refund as the work / review as</u> <u>begun.</u> [Note the copying of the typographical error where "as begun" should be "has |

|  | begun"]. |
|---|---|
| *"HOW TO SEND A CASE" Page* | *"How to Send a Case " Page* |
| SEND CASE VIA <u>FILE SHARING</u><br><br><u>Email</u><br><u>director@</u>american<u>medicalexperts.com</u> and tell us that you would like to upload your files to a file-sharing website. <u>We will</u> send <u>you the link</u> and instructions to proceed with this transmission option. | <u>FILE SHARING</u><br><br><u>Email</u><br><u>director@</u>prime<u>medicalexperts.com</u> a summary of your case along with what material you are going to send. <u>We will</u> share <u>with you the link</u> to upload the material. |

| | |
|---|---|
| SEND CASE VIA <u>EMAIL</u> | <u>EMAIL</u> |
| If you choose to send your case to AME <u>via e-mail</u>, <u>please follow the</u>se specific instructions to ensure complete delivery of your files: | <u>Please follow the</u> below when sending <u>via email</u>: |
| • <u>Use a pdf format</u> or jpeg image file for all files. | • <u>Use PDF format</u> for records (word document is acceptable for a cover letter). |
| • Do not allow your <u>email to exceed</u> 10MB. | • Please make sure the <u>email</u> does not <u>exceed</u> 20MB-25MB. |
| • <u>Email</u> your <u>records to</u> <u>director@american</u>medicalexperts.com <u>and</u> be sure to <u>call</u> <u>our office</u> at either <u>703</u>-542-8362 or toll-free 888-678-EXPERTS to request a confirmation of receipt of these files | • <u>Email</u> the <u>records to</u> <u>director@prime</u>medicalexperts.com <u>and call our office at 703</u>-717-3292 <u>to</u> confirm that we received all your material. |
| • <br> <u>If you have</u> additional <u>items</u> for review <u>that cannot be</u> transmitted <u>via email</u> (x-rays, MRIs, CT scans, etc.) <u>please notify our offices</u> to expect those <u>in the mail</u>. | • <u>If you have items that cannot be</u> sent <u>via email</u>, such as imaging CDs, <u>please notify our office</u> so we can look out for those items <u>in the mail.</u> |
| [Note the copying of words and tweaking of other words, but yet same ideas and formatting.] | [Note the copying of words and tweaking of other words, but yet same ideas and formatting.] |
| | |
| <u>If you choose to send</u> your <u>case/records to</u> AME <u>by mail</u> (i.e., USPS, FedEx, UPS, etc.), make <u>sure you</u> <u>use our physical address</u> | <u>If you choose to send</u> a <u>case</u> and the <u>records to</u> us <u>by mail</u> (i.e., USPS, FedEx, UPS, etc.), be <u>sure to</u> <u>use our physical</u> |

| | |
|---|---|
| (listed below) and not our PO Box.<br><br>American <u>Medical Experts LLC</u><br>25448 Fritz Court<br><u>Aldie, VA 20105</u><br><br>[Note physical address, same City, State, Zip code. Not to mention the Name of Business is very close. Created purposefully to compete and harm AME.] | <u>address (listed below).</u><br><br>    Prime <u>Medical Experts LLC</u><br>    25642 Balint Park Ct<br>    <u>Aldie, VA 20105</u><br><br>[Note physical address, same City, State, Zip code. Not to mention the Name of Business is very close. Created purposefully to compete and harm AME.] |
| <u>If you are sending hard copies</u> to our office, please <u>DO NOT send any originals (you must keep a complete copy of all items, A</u><u>ME is not responsible for any records sent into our office) as well as pages that are stapled or double-sided.</u><br><br>[Note copying of the capital letter "DO NOT", in addition to copying the entire paragraph.] | <u>If you are sending hard copies,</u> <u>DO NOT send any originals (you must keep a complete copy of all items. P</u><u>ME is not responsible for any records sent into our office) as well as pages that are stapled or double-sided.</u><br><br>[Note copying of the capital letter "DO NOT", in addition to copying the entire paragraph.] |
| <u>A</u><u>ME is not responsible for any original documents sent into our office</u> for review. <u>In addition,</u> please note that AME <u>discards ALL hard copies of records, imaging, CDs, etc</u> [note the missing period after etc] <u>that has been sent to our office after</u> <u>1 year of the</u> | <u>PME is not responsible for any original documents that are sent to our office.</u>  <u>In addition,</u> PME <u>discards ALL hard copies of records, imaging, CDs, etc</u> [Note the missing period after etc] <u>that have been sent to our office after</u> <u>the completion of</u> |

| | |
|---|---|
| completion of the work product report. Again, AME is NOT responsible for any records (not responsible for any items) that have been sent to our office and we require your office or the individual to keep a copy of all items sent to AME for review.<br><br>[Note capitalized words copied as is "ALL", "NOT", copied capital letter] | the service. Again, PME is NOT responsible for any records (or any items) that have been sent to our office and we require your office or the individual to keep a copy of all items sent to PME for review.<br><br>[Note capitalized words copied as is "ALL", "NOT", copied capital letter] |
| If you want anything that has been sent to our office returned, this request must be made in writing prior to sending over the item(s) to our office that you want to be returned and you must enclose a prepaid label to have this item returned as AME is not responsible for items shipped to our office, shipped to the expert or back to your office. | If you need, want or request to have the records returned after the service is completed, this request must be made in writing before sending the item(s) to our office, as we need to be aware of this request prior to accepting the files via hard copy. If the request is made and we accept, then you must include a prepaid label to have material returned as PME is not responsible for items shipped to our office, shipped to the expert or back to your office. |
| American Medical Experts LLC<br>25448 Fritz Court | Prime Medical Experts LLC |

| | |
|---|---|
| Aldie, VA 20105 | 25642 Balint Park Ct<br>Aldie, VA 20105 |
| <u>ITEMS TO INCLUDE WITH YOUR CASE</u><br><br>• <u>Cover letter:</u> In your <u>cover letter</u> let us know whether you require a Complete Case Review or an <u>Expert Witness</u> Report (please see our Flat Rate Fee Schedule for details of each service).<br><br><u>If you require an Expert Witness</u> Report, <u>you must specify the exact</u> specialty of the Expert that <u>you need to review your case in writing (i.e., Neurosurgeon, Plastic Surgeon, Orthopedic Surgeon, etc.)</u> as well as <u>any specific requirements for this expert, (type of procedure</u> involved<u>, active practice, teaching, any statute requirements etc.).</u><br><br>• Please specify the legalese (legal language) required for your expert witness report (i.e. <u>state requirements</u>), upfront prior to the review by the expert.<br><br>Please note that expert witnesses are not attorneys, they will need specific language to meet your state requirements; <u>affidavit</u>, certificates etc. are typically supplied and prepared (<u>format</u>, correct legalese) by the attorney on the case.  The expert will update the medical language and their expert opinion.<br><br>• <u>Medical Records</u>: <u>For the Medical Records or documents to be reviewed,</u> examine <u>each page to make sure</u> copies <u>are legible</u>. | <u>Items to include with your case</u><br><br>• <u>Cover letter:</u> The <u>cover letter</u> must specify which service you want us to perform.<br><br><u>If you require an Expert Witness</u> Opinion from a specialist, <u>you must specify the exact</u> type of specialist <u>you need to review your case in writing (i.e., Neurosurgeon, Plastic Surgeon, Orthopedic Surgeon, etc.)</u> along <u>with any specific requirements for this expert, (type of procedure, active practice, teaching, any statute requirements etc.)</u> and any requirements you have for your state.<br><br>• We are not a law office and are not familiar with the <u>requirements</u> for all 50 <u>states</u>, so we are depending on you to provide us with those requirements, if any. It is important to include a summary of the case along with specific questions you want the expert to answer.<br><br>In addition, if you include a statement from your client, we recommend that the statement is written in an <u>Affidavit format</u>.<br><br>• <u>Medical Records</u>: <u>For the Medical Records or documents to be reviewed,</u> please check <u>each page to make sure they are legible.</u> |

- If the records are still in the order in which you received them from the hospital, this does not necessarily mean they are complete, we recommend that you request a certified complete copy.

- X-rays, CTs MRI, Images, etc.: When relevant to your case, x-ray studies are often requested by our Experts so they may be reviewed. Many find the x-ray reports alone to be an unacceptable basis for their opinion. The x-rays you send to us should be good quality copies. You can obtain copies from the Hospital.

- **Payment**: Include your Firm's check for the correct amount and make it payable to: American Medical Experts, LLC. Be sure to include the appropriate fee for our Complete Case Review, Expert Witness Report, Expedited Fee, voluminous records charge as well as all other services we provide are listed on our Fee Schedule page or call our office and we will assist you.

For the convenience of your billing and accounting records, AME accepts all major credit cards: per our office policy, we do NOT accept personal checks or credit card transactions from your clients. If your clients are going to be paying for your case review, we require a cashier's check or money orders.

---

- If the records are in the order in which you received them from the hospital, this does not necessarily mean they are complete. We always recommend that you request a certified copy in order to ensure they are complete.

- Imaging CDs.: Images and imaging CDs are typically important on most cases. Most experts find the will not accept the imaging reports as a source for their opinions, as the reports may be in accurate and they want to review the imaging themselves to formulate an opinion.

- Payment: Include a Firm's check: Prime Medical Experts, LLC. Please confirm the accurate fee based on the service option that you choose along with any voluminous records charge, expedited fee, etc.

- PME accepts all major credit cards: ONLY from Law offices. We do NOT accept any personal checks or credit cards from your clients. If your client is going to pay us directly, it must be a cashier's check, money order or wire transfer.

---

| ITEMS TO INCLUDE WITH YOUR CASE | ITEMS TO INCLUDE WITH YOUR CASE |
|---|---|